Henry THOLE, Ralph Thole, John Lograsso, Jack Hale, Harry Schlotte, Chet Swalley, W & S Novelty, Inc. and American Cigarette Vending Company, Petitioners-Respondents,

v.

George R. WESTFALL, Prosecuting Attorney of St. Louis County, Mo., Countermovant-Appellant.

No. 47929.

Missouri Court of Appeals,
Eastern District,
Division Twelve.

Oct. 9, 1984.

Motion for Rehearing and Transfer Denied Nov. 20, 1984.

Application to Transfer Denied
Jan. 15, 1985.

Thomas W. Wehrle, Timothy L. Grosch, Clayton, for countermovant-appellant.

Roy A. Walther, Jr., J. Martin Hadican, Dewey S. Godfrey, Jr., Robert Herman, St. Louis, for petitioners-respondents.

DONALD BARNES, Special Judge.

This is an appeal of several cases which were consolidated at trial below. All the cases involve video games that were seized, pursuant to warrants, from several bars and taverns in St. Louis County on August 5, 1982. The sole issue[1] for our consideration is whether the court below misinterpreted and misapplied Missouri gambling laws in holding that none of the games was a gambling device subject to forfeiture under § 572.120 RSMo 1978.

The games are described in the record as "Omega Double Up", "Royal Flush", "Electro Sport Draw Poker", "Electro Sport Draw Poker II", "Double Up", "Draw 90 Card Game", "Draw 80 Card Game", "Tuni Electro", "Draw Poker Video", "Draw Poker", "Sweet Shawnee II", "Shawnee # 2", "Kenney Sweet Shawnee", "Circus Days", and "Players Choice". All were leased, usually under oral profit sharing arrangements, by their respective owners (Respondents herein) to the bars and taverns from which they were seized.

The characteristics and play of the machines are not in dispute. Four simulate slot machine play, one features Black Jack poker and the remainder are programmed to simulate some of the elements of draw poker. The electronic circuitry of the slot machine devices is programmed to produce, at random, images of various objects which "rotate" on the screen. When the "rotation" stops, the player is awarded "points" if designated combinations of objects are shown or highlighted.[2] The circuitry of the poker devices produces an electronic simulation of a hand of five cards, in the case of draw poker, or two hands of two cards (the "dealer's" and the player's), in the case of Black Jack. After the cards are displayed, the player must press a button to indicate whether he wishes to "stand pat" or, in the case of draw poker, to discard and have replacement cards "dealt" or, in the case of Black Jack, to simply have additional cards "dealt". If the resulting hand is a winning hand according to the rules of the respective games, the player is awarded "points".[3] Some devices allow players to accumulate up to 9,999 points.

All machines are coin operated accepting from a single coin to multiples of coins, in some cases hundreds of coins (generally quarters) at a time and will credit the player one "point" for each coin inserted. The machines are programmed so that points credited for coins and points won for successful play may be used in the same manner: either may be used to replay the device and, on some machines, may also be bet, up to ten at a time, on any one replay. All points, whether won or paid for, are thus equal in value to an equivalent number of coins.

On most machines, points of players who do not wish to continue play may be erased by using a "knock down" button or switch. The number of points so erased is either recorded on meters concealed from public view or stored in "memory" and brought up only by flipping a special switch or entering a special code. At trial, the owners of these machines testified they were aware of this recording feature but could not explain its purpose.[4] Appellant's expert witness, William L. Holmes, an agent with FBI gambling unit, testified that a record of total points erased was useful only if someone were making payoffs for

---

1. Respondents also contend that the applicable provisions of the Missouri Gambling Code are unconstitutionally vague. This contention was not raised below and we find no merit in it.

2. Some of the slot machine games also give winning players the option of holding objects over to the next rotation and betting "double, triple or nothing" on that rotation.

3. Many draw poker machines also have a "double up" option whereby a winning player can

bet the points he's won, "double or nothing", on whether the next randomly "dealt" card is above or below an eight.

4. Owners' responses to questions about the purpose of recording total points were: "This came with the machine. I didn't make the machine that way." "If you didn't have that, you wouldn't get a true picture of what the machine is doing ... this is what they tell me. Now I don't know. All I know is what they tell me."

points won and needed a record of points paid off (points erased) so that he could be reimbursed by the machine's owner.

Although there was no evidence that cash payoffs had been made on the machines in issue, Officer Schupp of the St. Louis County Police Department testified that, in the course of his department's investigations, he had observed bar owners making cash payoffs on an "Omega Double Up" and "Draw 90" like those in issue. He testified that bar owners made the payoffs (ten dollars for forty points and thirty dollars for one hundred twenty points) and then erased the points paid off.

The trial court held that, since the machines in issue directly pay off only in free replays, they are capable of innocent use and thus may not be declared forfeit without evidence that other types of payoffs have been made. Appellant, the Prosecuting Attorney for St. Louis County, contends the trial court, in so holding, misinterpreted and misapplied the applicable gambling laws.

■ We begin with the fundamentals. In Missouri, a machine may be deemed a gambling device even when there is no showing that it has been used for gambling. § 572.010(5) RSMo 1978 defines gambling devices to include devices that are *usable*, as well as those that are used, in gambling. Of course, not every device that is merely usable in gambling may be seized. Such a device, with the exception of a slot machine, is subject to seizure only if its possessors knew or had reason to believe it was *to be* used in gambling. §§ 572.120 and 572.070 RSMo 1978.[5] When it is obvious, from the appearance and play of a device, that it was specifically devised for gambling, the device itself will be circumstantial evidence that its possessors knew it was to be so used.[6] Whether or not such a device is *capable* of innocent use is irrelevant; *any* device may be used innocently just as any device may be used in gambling.

■ § 572.010(4), (3), (12) RSMo 1978[7] provide the basis for determining whether a device is specifically devised for gambling. These definitions show that gambling includes playing games wherein 1) players stake or risk something of value, 2) chance is a material factor and 3) success-

"That's the way the machine came ... I don't use it."

5. Section 572.120:
"Any gambling device or gambling record, or any money used as bets or stakes in unlawful gambling activity, possessed or used in violation of this chapter may be seized by any peace officer and is forfeited to the state...".
Section 572.070:
"1. A person commits the crime of possession of a gambling device if, with knowledge of the character thereof, he manufactures, sells, transports, places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of:
(1) A slot machine; or
(2) Any other gambling device, knowing or having reason to believe that it is to be used in the state of Missouri in the advancement of unlawful gambling activity...".

6. In a forfeiture proceeding, evidence that a possessor had reason to know... must be "clear and convincing" but need not be "beyond a reasonable doubt". *See* § 542.301(4) RSMo Supp.1984.

7. Section 572.010:

"'Gambling', a person engages in 'gambling' when he *stakes* or *risks something of value* upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome. Gambling does not include bona fide business transactions valid under the law of contracts, including but not limited to contracts for the purchase or sale at a future date of securities or commodities, and agreements to compensate for loss caused by the happening of chance, including but not limited to contracts of indemnity or guaranty and life, health or accident insurance; nor does gambling include playing an amusement device that confers only an immediate right of replay not exchangeable for something of value;"
Section 572.010(3):
"'Contest of chance' means any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that the skill of the contestants may also be a factor therein;"
Section 572.010(12):
"'Something of value' means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating

ful play is rewarded by "something of value". The only game expressly excluded from the definition of gambling is "an amusement device that confers only an immediate right of replay not exchangeable for something of value". Thus, a device should be considered an inherent gambling device—a gambling device per se—if it 1) features a game with the aforementioned elements and 2) does not fall within the statutory exception.

 We believe that the devices in issue feature games with all the gambling elements. Players must insert coins in order to initiate play, and it is obvious from the character of the featured games that this money is "staked or risked". It is also apparent that the outcome of the games depends, in a material way, upon the element of chance.[8] In the slot machine games, the objects that appear on the screen are determined by the devices' electronic circuitry and the player has no control over which combination of objects will appear. Thus, from the player's point of view, winning is purely a matter of luck, a matter of chance.[9] In the Black Jack and draw poker games, the player decides

whether additional cards will be dealt but has no control over other factors materially affecting the composition of the final hand: the cards initially displayed and the cards selected either as additions to the original hand (in the case of Black Jack) or as replacements for the discards (in the case of draw poker) are determined by the games' electronic circuitry. Thus, for even the most exceptional player, chance plays a significant role in determining whether he wins or loses.[10, 11] And finally it is clear that, upon successful play, the seized devices award "something of value". "Something of value" is defined, in § 572.010(12) RSMo 1978, to include, among other things, any form of credit "involving extension of ... a privilege of playing at a game ... without charge". It is undisputed that the points awarded on these devices may be used to replay the games without charge.

 We also do not believe that *all* of the games fall within the statutory exception. The only "free replay" device exempt from the definition of gambling is "an amusement device that confers only an immediate right of replay *not exchangeable for something of value* (emphasis added)".

transfer of money or property or of any interest therein or involving extension of a service, entertainment or a privilege of playing at a game of scheme without charge;"

Since gambling includes many diverse activities—lotteries, bookmaking, direct play between individuals, play by individuals on mechanical contrivances—the definitions relating to gambling are necessarily broad. *See* "Gambling Laws of Missouri", 7 Journal of the Missouri Bar 85 (May 1951).

8. In Missouri, chance must be a material element in determining the outcome of a gambling game. It need not be the *dominant* element. *See* § 572.010(3) RSMo 1978 and Comments to § 572.010 RSMo 1978.

9. Even on machines with the option described in fn. 2, *supra,* a player makes no decisions and otherwise has no control until after a "rotation". Thus, although knowledge of the total number of objects on these devices could be helpful in deciding whether to play the option, chance is very significant in determining one's winnings since chance determines whether a player has the opportunity to play the option. And, since the option involves another randomly generated "rotation", chance plays a material part in the outcome of the option play as well.

10. Two of respondents' expert witnesses, both professors of electrical engineering, stated that tests they conducted showed that a player with knowledge of probability theory will, on the average, win significantly more video poker games than one without this knowledge. This testimony does not conflict with our holding that chance is a material element in the play of these games. The outcome of a game may depend significantly on chance "notwithstanding that the skill of the contestants is a factor therein". § 572.010(3) RSMo 1978.

It should perhaps also be noted that, "the test of whether a game is one of skill or chance ... is not ... measured by the standard of experts or any limited class of players, but by that of the average skill of the majority of players likely to play the game...". *State v. Prevo,* 44 Haw. 665, 361 P.2d 1044, 1051 (1961).

11. We also note the evidence that payoff percentages on these games are generally determined either by the programming or by adjustable dials on the machines. Thus, in the long run, players can win no more than the machine allows.

§ 572.010(4) RSMo 1978. On some of the machines, the number of replay points potentially awardable is so great that it may be assumed that they are exchangeable for something of value.[12] More significantly, most of the devices record total "replay points" erased, and this record serves no useful purpose unless these points have been exchanged for cash payoffs or other things of value. Where points have been so exchanged, such a record is very useful as it enables the owner of the device to calculate total payoffs made by those he must reimburse. We therefore hold that, where a device capable of awarding hundreds of free replays (which perhaps would take hours to days to play off) records information that has no purpose unless replay rights are exchanged for other things of value, there is no merit in the contention that the device awards only "an immediate right of replay not exchangeable for something of value".

■ The trial court also held that there was no evidence that the owners of any of the devices had reason to know they were to be used in gambling. We disagree. Video poker and slot machine games that are designed to award hundreds of "replays" and to count and record cancelled "replays" are, in and of themselves, clear and convincing circumstantial evidence that their possessors knew they were intended for use in gambling. Their owners' mere assertions that they did not know the devices were used for gambling will not bar forfeiture.

Although whether a device is inherently a gambling device is purely a matter of state law, we note that: 1) Pennsylvania and Illinois have found devices with meters for recording cancelled replays to be gambling devices per se. *See Com. v. Two Electronic Poker Game Machines*, 502 Pa. 186, 465 A.2d 973 (1983); *People v. One Machine Known as "Circus Days"*, 23 Ill.

App.2d 480, 163 N.E.2d 223 (1960); 2) the fact that owners had removed switches for erasing credits was significant in a recent Kansas decision holding that video poker games were not gambling devices. *See Games Management, Inc. v. Owens*, 233 Kan. 444, 662 P.2d 260, 263 (H3) (1983); 3) Meters for recording erased points have long been deemed significant in determining whether "free replay" machines are gambling devices. *See* 38 Am.Jur.2d Gambling § 92; "Gambling", 269 Annals of the American Adacemy of Political and Social Science 62–70 (1950); *See also United States v. Two Coin-Operated Pinball Machines*, 241 F.Supp. 57, 59 (W.D.Ky.1965); *Szybski v. United States*, 220 F.Supp. 806, 811 (E.D.Wisc.1963).

We thus reverse and remand for proceedings consistent with this opinion.

SNYDER, J., and DOUGLAS GREENE, Special Judge, concur.

---

12. The comments to § 572.010 RSMo 1978 indicate that the exception was added to exclude "trivial amusement such as *an* additional pinball game (emphasis added)". We do not believe any "game of chance" that awards hundreds of free replays is covered by this exclusion. It might be added a claim that the re-peated insertion of a coin or many coins into a machine to watch objects, numbers or cards appear at random in display windows, each operation completed in five seconds or less, could be "amusing" to even a grade school boy stretches one's imagination.